David R. NICHOLS, Appellant,

v.

COMMONWEALTH OF KENTUCKY, Appellee.

No. 2002–SC–0163–MR.

Supreme Court of Kentucky.

June 17, 2004.

Rehearing Denied Sept. 23, 2004.

---

Dennis Stutsman, Department of Public Advocacy, Appellate Branch Manager, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Samuel J. Floyd, Jr., Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice KELLER.

## I. INTRODUCTION

Appellant, David Nichols, was convicted of Wanton Murder and Assault under Extreme Emotional Disturbance ("EED") and was also found to be a Second–Degree Persistent Felony Offender ("PFO"). The jury recommended a PFO-enhanced sentence of life on the Wanton Murder conviction and a PFO-enhanced sentence of ten (10) years on the Assault under EED conviction. The jury recommended that the sentences run concurrently with each other for a total sentence of life. The trial court sentenced Appellant in accordance with the jury's recommendation, and he appeals to this Court as a matter of right.[1]

---

1. KY. CONST. § 110(2)(b).

Appellant contends that the trial court erred: (1) in refusing to instruct the jury on the defense of voluntary intoxication, (2) in placing the EED instruction as it related to Intentional Murder in the "Presumption of Innocence" instruction, (3) in failing to suppress his inculpatory statements made to the police while he was intoxicated, and (4) in failing to direct a verdict in his favor on the charges of Intentional and Wanton Murder. Although we find that the trial court erred in failing to instruct on voluntary intoxication, we hold that the omission was harmless as to the Wanton Murder conviction, and therefore, we affirm that conviction. But, because of the omission, we reverse Appellant's conviction of Assault under EED and remand for a new trial on Assault under EED.

## II. BACKGROUND

On Friday, August 18, 2000, after an evening at a local night club, a group of individuals gathered at Charlie Mattingly, Jr.'s apartment in Lebanon, Kentucky. The individuals were playing cards when Appellant arrived at the apartment. Appellant was not well known to them since he had only briefly encountered some of the apartment's occupants for the first time a few days earlier. Appellant left shortly after arriving, and there was conflicting testimony at trial regarding the reason for his departure. Appellant claimed that he was asked to leave but understood that he was welcome to return later. The Commonwealth, however, claimed that Appellant was repeatedly asked to leave because of his erratic behavior. The Commonwealth also claimed that Appellant arrived at the apartment carrying a large kitchen knife and that some of the individuals present in the apartment feared that he would become violent.

Upon returning to the building and after again being asked to leave, Appellant became combative, stood outside the apartment building taunting the occupants of the apartment, shouting threats, and waving the knife around. Several witnesses testified that Appellant indicated that he wanted to take the knife and go to Water Street to "kill some ni-ers" whom he claimed had stolen money from him. At some point, the occupants of the apartment called the police and reported the disturbance.

Steven Pittman, a friend of the individuals inside the apartment, heard the dispatch over his police scanner and proceeded to the apartment to check on the occupants. Pittman testified that when he arrived at the residence, Appellant was standing at the bottom of the steps leading up to the second floor apartment. Pittman claimed that he moved past Appellant and went up to the apartment, and returned a few minutes later to ask Appellant to leave. In response, Appellant hit Pittman in the side of the head, knocking him to the ground, and then jumped on his back and began stabbing him.

Several individuals from the second floor apartment came rushing down to help and among them was eighteen (18) year old Joshua Wright. Wright attempted to pull Appellant off of Pittman and was fatally stabbed in the chest by Appellant. Several witnesses testified that after stabbing Wright, Appellant ran away from the group, yelling, "Who else wants to die?" Wright's friends rushed him to the Spring View Hospital, where he died a short time later. Pittman suffered serious but not fatal injuries.

At trial, Dr. Keith Caruso, a forensic psychiatrist, testified that as a result of childhood trauma, Appellant suffered severe mood swings and paranoid beliefs, but

688

he was not delusional. Appellant did not contest that he had stabbed Pittman and fatally stabbed Wright; rather, Appellant claimed that he acted in self-protection or under the influence of an extreme emotional disturbance. Appellant also maintained that because he was intoxicated at the time of the events in question, he was unable to form the requisite intent for the crimes charged.

As to the homicide charge, the trial court instructed the jury separately on Intentional Murder, Wanton Murder, First-Degree Manslaughter, Second-Degree Manslaughter, and Reckless Homicide. As to the assault charge, the jury was instructed separately on Second-Degree Assault and Assault under EED. The absence of self-protection was included as an element in all instructions except for the Assault under EED instruction and the absence of EED was an element of the Intentional Murder instruction. The trial court's instructions also included separate instructions on self-protection.

A wanton or reckless belief qualification was added to the self-protection instruction on the homicide offenses, and the self-protection instruction on Second-Degree Assault included a reckless belief qualification, which, if believed, would have allowed the jury to convict Appellant of Fourth-Degree Assault. The instruction captioned "Presumption of Innocence" directed the jury to find Appellant guilty of First-Degree Manslaughter if they believed beyond a reasonable doubt that he was guilty of Intentional Murder but had a reasonable doubt as to whether Appellant was acting under the influence of EED. The trial court did not give an instruction on voluntary intoxication nor make its ab-

sence an element of Intentional Murder, First-Degree Manslaughter, or Second-Degree Assault.

Under the guidance of these instructions, the jury found Appellant guilty of Wanton Murder and Assault under EED and also found him to be a Second-Degree Persistent Felony Offender ("PFO"). In accordance with the jury's recommendation, the trial court sentenced Appellant to a PFO-enhanced sentence of life on the Wanton Murder conviction and a PFO-enhanced sentence of ten (10) years on the assault conviction to run concurrently with each other for a total sentence of life.

## III. ANALYSIS

### A. Voluntary Intoxication Instruction

■ Appellant contends that the trial court committed reversible error in refusing to instruct the jury on the defense of voluntary intoxication. "A voluntary intoxication instruction is justified ... when there is evidence that the defendant was so drunk that he did not know what he was doing, or when the intoxication [negates] the existence of an element of the offense."[2] In other words, "[w]henever a defendant adduces sufficient evidence of voluntary intoxication, the defendant is entitled to an instruction on the defense of intoxication."[3] Although "mere drunkenness does not equate with the Kentucky Penal Code's definition of the 'defense' of voluntary intoxication,"[4] we believe, however, that the evidence here demonstrated more than "mere drunkenness" and supported the requested instruction.

First, in his statement to Officer Waters, Appellant stated that he was "f—ked

**2.** *Rogers v. Commonwealth,* Ky., 86 S.W.3d 29, 44 (2002) (footnotes and internal quotation marks omitted).

**3.** *Mills v. Commonwealth,* Ky., 996 S.W.2d 473, 490 (1999).

**4.** *Rogers,* 86 S.W.3d at 44.

up" as he had consumed several beers and a pint of vodka[5] shortly before his first appearance at Charlie Mattingly, Jr.'s ("Mattingly") apartment. Second, the Commonwealth's witnesses Mattingly, Mitchell Deering ("Deering"), and Jerry Abell ("Abell") perceived Appellant as being intoxicated. Mattingly testifed that Appellant was "acting wild, like he was drunk or something." Deering stated that Appellant seemed under the influence and out of control. Abell testified that Appellant was under the influence of alcohol or some other substance. Finally, Officer Waters testified that while Appellant did not appear to be "fully" under the influence of alcohol, it was apparent to him that Appellant had consumed alcohol at some point in the evening.

■ From this testimony, the jury reasonably could have concluded that Appellant was intoxicated and that because of his intoxication, he could not have formed the requisite mens rea for the offenses in the trial court's instructions that required specific intent. Thus, in light of the evidence, and because a finding of intoxication would negate the intent element of Intentional Murder, First–Degree Manslaughter, and Intentional Second–Degree Assault,[6] we agree with Appellant and hold that he was entitled to an instruction on voluntary intoxication. We find, however, that this error was harmless[7] as to Appellant's Wanton Murder conviction because voluntary intoxication, which does negate an element of specific intent offenses, does not negate any element of Wanton Murder, particularly the mens rea of "wantonness."[8]

Citing *Fields v. Commonwealth,*[9] *Springer v. Commonwealth,*[10] and *Slaven v. Commonwealth,*[11] Appellant argues that even though the trial court gave a Second–Degree Manslaughter instruction, the trial court was required to instruct the jury that if it found Appellant not guilty of Intentional Murder as a result of his voluntary intoxication, then Second–Degree Manslaughter "was the instruction that would apply," and the trial court's failure to do so was reversible error.

■ Under *Fields, Springer,* and *Slaven,* Appellant was entitled to an instruction on Second–Degree Manslaughter, and one was given by the trial court; however, he was not entitled to a further instruction directing the jury to proceed directly to the Second–Degree Manslaughter instruction upon a finding of voluntary intoxication as that would result in a by-pass of the Wanton Murder instruction. *Fields,* in particular, holds that if a jury is instructed on voluntary intoxication as a defense to Intentional Murder or First–Degree Manslaughter, it must also be instructed on Second–Degree Manslaughter as a lesser included offense; however, *Fields, Springer,* and *Slaven* do not hold that an instruction on Wanton Murder is not warranted solely because the jury is instructed on the defense of voluntary intoxication. It is the duty of the trial court to give instructions on the whole law of the case and that

---

**5.** The record indicates that Appellant may have consumed as much as one and one-half pints of vodka and six or seven beers.

**6.** *Rogers,* 86 S.W.3d at 44.

**7.** RCr 9.24.

**8.** KRS 501.020(3); *McGuire v. Commonwealth,* Ky., 885 S.W.2d 931, 934 (1994)

("Voluntary intoxication does not negate culpability for a crime requiring a culpable mental state of wantonness or recklessness, but it does negate specific intent.").

**9.** Ky., 12 S.W.3d 275, 283 (2000).

**10.** Ky, 998 S.W.2d 439, 454–55 (1999).

**11.** Ky, 962 S.W.2d 845, 856–57 (1997).

means giving instructions on any alternative or lesser offense supported by the evidence.[12] Accordingly, if a Wanton Murder instruction was supported by evidence, it was appropriate regardless of whether the jury was also instructed on the defense of voluntary intoxication. Here, the evidence supported an instruction on Wanton Murder. Appellant, who admittedly was intoxicated, engaged in a fight with Pittman and stabbed him in the back. When Wright attempted to pull the Appellant off of Pittman, he fatally stabbed Wright in the chest. From that evidence alone, it was not unreasonable for the jury to find that Appellant either intentionally caused Wright's death or did so wantonly under circumstances manifesting an extreme indifference to human life. Accordingly, we hold that even if the trial court had instructed the jury on voluntary intoxication, it would not have been error for the trial court to refuse to give a further instruction directing the jury to by-pass the Wanton Murder instruction and proceed directly to the Second–Degree Manslaughter instruction.

Alternatively, Appellant contends that under *Fields* and *Slaven* his Wanton Murder conviction was improper because a finding of voluntary intoxication reduces Intentional Murder to Second–Degree Manslaughter. There is a great difference between being entitled to a voluntary intoxication instruction and a jury finding of voluntary intoxication, and, as previously explained, a finding of voluntary intoxication does not foreclose a simultaneous finding of wantonness or aggravated wantonness, if supported by the evidence. A finding of voluntary intoxication does not preclude a conviction of Wanton Murder, and thus the failure to instruct on voluntary intoxication was harmless as to Appellant's Wanton Murder conviction.

■ The Second–Degree Assault instruction, on the other hand, required the jury to find that Appellant "intentionally caused a physical injury to Steve Pittman." Because a finding of voluntary intoxication by the jury would negate the specific intent element of Second–Degree Assault, Appellant was prejudiced by the failure of the trial court to instruct on voluntary intoxication as it deprived him of the lesser included offenses of Wanton or Reckless Fourth–Degree Assault. We, therefore, reverse Appellant's conviction of Assault under EED and remand to the trial court for retrial on Assault under EED.[13]

## B. EED Instruction

■ Appellant claims that the trial court committed reversible error by "burying" the EED instruction as it related to Intentional Murder in the "Presumption of Innocence" instruction. He argues that because the EED instruction did not immediately follow the Intentional Murder instruction (the first of eleven (11) instructions) and was placed instead in the "Presumption of Innocence" instruction (instruction number ten (10)) the jury was required to consider whether Appellant was guilty of the other offenses "without fully understanding the complete inten-

---

12. *Holland v. Commonwealth,* Ky., 114 S.W.3d 792, 802 (2003).

13. On any retrial, the instruction on Assault under EED will include the elements of Second–Degree Assault as previously given by the trial court and the additional element of "That in so doing, he was acting under the influence of an extreme emotional distur-

bance." The trial court will also instruct separately on intoxication, *see* 1 COOPER, KENTUCKY INSTRUCTIONS TO JURIES (CRIMINAL) § 11:30 (4th ed. Anderson 1999), but it is not necessary to include the absence of intoxication as an element. *Slaven v. Commonwealth,* Ky., 962 S.W.2d 845, 857 (1997).

tional murder with extreme emotional disturbance instruction." He also argues that the jury was unclear as to how to apply EED to Intentional Murder.

■ Appellant admits that this claim of error was not preserved for appellate review by contemporaneous objection, but he urges this Court to conduct review under RCr 10.26.[14] We decline to do so because an alleged error is not reviewable under RCr 10.26 unless (1) it is "[a] palpable error," and (2) "a determination is made that manifest injustice [has] resulted from the error."[15] Here, the claimed error is neither "palpable" nor did "manifest injustice" result from it. "Palpable" means "[e]asily perceived; obvious."[16] Thus, a "palpable error" is an error that is easily perceived or obvious. "[M]anifest injustice" means "[a]n error in the trial court that is direct, obvious, and observable, such as a defendant's guilty plea that is involuntary or that is based on a plea agreement that the prosecution rescinds."[17]

■ The placement of the EED instruction at the end, in the "Presumption of Innocence" instruction, was not an error that is "direct, obvious, and observable." The absence of extreme emotional disturbance is not an element of murder.[18] "The presence or absence of extreme emotional disturbance is a matter of evidence, not an element of the crime. [It is] . . . a matter of the circumstances of each homicide."[19]

Accordingly, no manifest injustice resulted from this claimed error.

■ Although we decline to review this claimed error in depth, the record shows that the trial court provided the jury with a copy of the instructions and read the instructions in their entirety to the jury prior to the closing arguments. Appellant's counsel and the Commonwealth's Attorney were free to point out in their closing arguments how the Intentional Murder, First–Degree Manslaughter, and EED instructions were related. And, we would note that, as evidenced by the fact that the jury found Appellant guilty of Assault under EED, the jury understood the application of the EED instruction. Thus, we do not believe that the jury failed to consider each instruction before rendering its verdict, nor do we believe that it did not understand how to apply EED to the Intentional Murder instruction.

## C. Appellant's Statements to Police

■ Appellant next contends that the trial court erred in failing to suppress his inculpatory statements to the police, which he claims were given while he was under the influence of alcohol. This error was preserved by Appellant's motion in limine to suppress the statements;[20] however, we find no merit in Appellant's contention.

■ In determining the voluntariness of statements obtained from an intox-

---

14. RCr 10.26 ("A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.").

15. *Id.*

16. AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 946 (4th ed.2000).

17. BLACK'S LAW DICTIONARY 974 (7th ed.1999).

18. *Wellman v. Commonwealth,* Ky., 694 S.W.2d 696 (1985).

19. *Id.* at 697.

20. KRE 103(d).

icated defendant, "the basic question is whether the confessor was in sufficient possession of his faculties to give a reliable statement[.]" [21]

It is only when intoxication reaches the state in which one has hallucinations or "begins to confabulate to compensate for his loss of memory for recent events" that the truth of what he says becomes strongly suspect. Loss of inhibitions and muscular coordination, impaired judgment, and subsequent amnesia do not necessarily (if at all) indicate that an intoxicated person did not know what he was saying when he said it. "In vino veritas" is an expression that did not originate in fancy. If we accept the confessions of the stupid, there is no good reason not to accept those of the drunk.[22]

▮ In the present case, Officer Jeffrey Waters, the only witness to testify at the suppression hearing, testified that Appellant related to him the amount of alcohol that he had consumed but refused to take a breath test for alcohol at both the police station and the detention center. Appellant signed a written acknowledgment of his *Miranda*[23] rights and was cognizant enough to refuse to give a taped statement. Additionally, Appellant was able to accurately describe the location of one of the knives he had with him that evening. Finally, Officer Waters testified that based on his experience as a police officer and the Appellant's behavior outlined above, Appellant was not under the "influence of anything" when he made his statements. Based upon Officer Waters's testimony, the trial court overruled Appellant's motion to suppress his statements.

Although we find that there was sufficient evidence presented at trial to allow a jury to find that the Appellant was so intoxicated at the time of the stabbing that he did not know what he was doing, there is no evidence to indicate that his condition persisted later at the police station where he made his statements to the police. Accordingly, we hold that since the trial court's ruling was based on substantial evidence that Appellant was "in sufficient possession of his faculties to give a reliable statement" and there is no evidence to indicate otherwise, Appellant's statements were made voluntarily and properly admitted.

## D. Directed Verdict Motion

▮ Appellant's final claim of error is that the trial court failed to direct a verdict on the charges of Intentional Murder and Wanton Murder. We review this claimed error under the standard articulated in *Commonwealth v. Benham:*[24]

On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserv[e] to the jury questions as to the credibility and weight to be given to such testimony.

On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable

21. *Britt v. Commonwealth,* Ky., 512 S.W.2d 496, 500 (1974).

22. *Id.* (footnote omitted).

23. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

24. Ky., 816 S.W.2d 186 (1991).

for a jury to find guilt, only then is the defendant entitled to a directed verdict.[25]

 First, we would note that Appellant was not convicted of Intentional Murder, and therefore, any error in not directing a verdict on that charge is clearly harmless. Second, "[a] motion for a directed verdict of acquittal should only be made (or granted) when the defendant is entitled to a complete acquittal, that is, when looking at the evidence as a whole, it would be clearly unreasonable for a jury to find the defendant guilty, under any possible theory, of any of the crimes charged in the indictment or of any lesser included offenses."[26] Appellant does not contest that the lesser offenses of First–Degree and Second–Degree Manslaughter were supported by the evidence; in fact, his primary argument is that these lesser offenses, instead of Intentional or Wanton Murder, were the ones appropriate under the evidence and the law. Although Appellant objected to the Wanton Murder instruction to preserve this claimed error,[27] in light of the evidence in this case, which is set forth in detail above in Part II, we do not find that the jury's verdict of Wanton Murder was "clearly unreasonable." Accordingly, we hold that the trial court properly denied Appellant's motion for a directed verdict.

## IV. CONCLUSION

We affirm Appellant's convictions of Wanton Murder, but we reverse his conviction of Assault under Extreme Emotional Disturbance because of the absence of an instruction on voluntary intoxication and remand for a new trial on Assault Under EED.

LAMBERT, C.J.; COOPER, GRAVES, JOHNSTONE and STUMBO, JJ., concur.

WINTERSHEIMER, J., concurs in affirming the Wanton Murder conviction but dissents as to the reversal and remand of the conviction of Assault Under EED.

---

25. *Id.* at 187. See also *Holland v. Commonwealth*, Ky., 114 S.W.3d 792, 809 (2003); *Commonwealth v. Sawhill*, Ky., 660 S.W.2d 3, 4–5 (1983) ("The clearly unreasonable test seems to be a higher standard for granting a directed verdict ... constitut[ing] an appellate standard of review."); *Trowel v. Commonwealth*, Ky., 550 S.W.2d 530, 533 (1977).

26. *Campbell v. Commonwealth*, Ky, 564 S.W.2d 528, 530–31 (1978).

