## Sexton v. Commonwealth.

March 4, 1947.

L. B. Handley, Judge.

Larimore & Craddock and Thompson & Walden for appellant.

Eldon S. Dummit, Attorney General, and H. K. Spear, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SILER—Reversing.

Grant Sexton, the appellant, was adjudged guilty of the voluntary manslaughter of a three year old child, James Chaney, with punishment fixed at 10 years in the penitentiary. Sexton appeals.

As grounds for reversal of the judgment against him, appellant now urges, among others, the following prejudicial errors of the trial court, viz., (1) that of refusing to direct a verdict in his behalf and (2) that of permitting improper argument to the jury by the Commonwealth Attorney.

1. In order to determine whether or not the trial court should have directed a verdict in favor of Sexton, it is now fitting to narrate the substance of the evidence which was produced against him on the trial. It appears that Sexton is middle-aged, of a low grade, childish mentality, totally illiterate, yet legally adjudged of sound mind prior to this trial. He was a poor and humble farmer, living in his own two room cottage with his wife, named Mollie, and a niece, named Stella, on his small farm in Metcalfe County. His place adjoined the place of a neighbor's family, that of Luther Chaney. And between these two neighboring families the relations were harmonious and pleasant, at least on the surface. The Chaneys had followed the practice of leaving, on occasions of necessity or convenience, some of their younger children with the Sextons. The Sextons had been consistently kind to the Chaney children, often buying them candy and chewing gum, sometimes keeping them overnight. Grant Sexton usually referred to the youngest child, James Chaney, the deceased, as "my baby."

The killing of James Chaney occurred on Thursday afternoon of June 13, 1946, around two or three o'clock, either within the Sexton home or about its premises. Mrs. Chaney had brought her two youngest children, this little boy, James, age almost three years, and his little sister, Patsy, age almost five years, to the Sexton home around the noon hour of that day and had requested the Sextons to keep these two children until they, the Chaneys, could make a trip to Edmonton, the county seat, for the purpose of getting a deed for some neighboring land the Chaneys had recently purchased. The Sextons agreed to keep the two children.

According to Grant Sexton, there was no one immediately present at the exact time of the killing of James Chaney, excepting Sexton himself, his niece Stella, and James' sister Patsy. Mrs. Sexton was somewhere about the place but did not see the killing take place, so far as

the record discloses. According to Sexton's story, little James had requested Sexton to get his gun and kill a squirrel. Whereupon, Sexton took his gun from its rack, broke it down for loading, then accidently shot and killed James Chaney in completing the loading process. He said that this occurred in the front room of the two room house while little James was standing there in that room at a place about five or six feet away from Sexton and while the two little girls, Stella and Patsy, were lying on the bed, whether asleep or awake Sexton did not know; that he, after the accidental discharge of this gun and upon realizing that little James had been shot and upon seeing him fall, dropped the shotgun to the floor, ran out of the back door of the cottage and into nearby woods, where some timber men were at work; that he briefly and excitedly indicated to the timber men that an accident had occurred and that they should go to Sexton's home; that he, without returning to his home, hurriedly continued through the woods and then on to Horse Cave, walking most of the way; that he, continuing on this same journey, went from Horse Cave to Nashville, Tennessee, where he arrived in the early morning hours of Friday, June 14th; that in Nashville he went to the home of his brother-in-law and remained there throughout that Friday and until Saturday without ever discussing the killing of little James with anyone; that he does not know how he traveled from Horse Cave to Nashville but that he knows he returned by bus from Nashville to Horse Cave on Saturday afternoon, June 15th; that upon his return to Horse Cave, he attended a picture show with a friend but still made no mention to anyone of the killing of little James; that he returned to his home in Metcalfe County by truck in the early morning of Sunday, June 16th, when he was arrested and taken to jail.

The Commonwealth's theory of this case was that Sexton had ardently wanted Luther Chaney to buy the Sexton place, and that having set his heart on that desire and having become suddenly embittered by the disappointing knowledge that on that very day of June 13th Luther Chaney was journeying to Edmonton to buy another place instead of Sexton's this appellant impulsively visited the madness of his retribution upon Luther Chaney's child, first hitting this child on the head

with some weapon, and then killing it with a shotgun blast in the abdomen. This theory, correct or otherwise, hypothesized a case of rather weird, bizarre, incongruous proportions, a crime of diabolic fiendishness, the authorship of which could have originated only in some demoniac type of mind. In support of this theory, the Commonwealth proved that Sexton had the mind of a child and that he had, in point of fact, attempted several times to sell Chaney the Sexton place; that although Sexton claimed the shooting of the child took place inside the Sexton house, yet there were no marks whatever inside the house, no bullet holes in the floors, walls or ceiling, tending to support Sexton's claim in this respect; that there were blood stains on the ground out beyond the house, including some on the grass in the yard and on the outside of the screen door and around the door step; that Sexton and his wife had been overheard in conversation at the jail some days after June 13th and before this trial, which conversation had indicated that "there were two more people" Sexton "wanted to kill;" that Sexton had stated that the "two more" people he wanted to kill were a Dr. York, who had upheld Sexton's sanity at the inquest before this trial, and Luther Chaney, Sexton's chief prosecutor on this trial; that the same conversation indicated that Sexton had planned to run off after this killing and further indicated that part of the clothing of this child, which was partly nude when found dead, had been burned by Sexton or his wife or by both of them outside their home; that pieces of the child's burned clothing had in fact been found and identified; that certain bruises were found about the face, head and eyes of this child, thus indicating that the child's injuries had not been limited to those caused by the discharge of the shotgun.

Thus, the trial court was confronted with these two conflicting theories as to the cause of this child's death. Appellant Sexton's theory was that of an accident. Appellee Commonwealth's theory was that of a voluntary manslaughter. Each side supported its own theory with the evidence summarized above. But there was one glaring, unexplained inconsistency which stagnated the mysterious depths of Sexton's promulgated theory. This inconsistency was that of the completely unscarred interior of the very room where Sexton claimed the shot-

gun blast killed little James. Such inconsistency floated around in foul confusion on the smooth surface of Sexton's story. This inconsistency projected itself in embarrassing apparency on the face of undisputed proof that the Sexton house bore no physical sign whatever of any shotgun blast. That condition made a physical situation which refused to corroborate Sexton. It probably damned him more completely than some other evidence, such as Sexton's flight immediately after the child's death. The flight by a person of Sexton's mentality and temperament might have been accepted. But this physical fact of an unexplained condition in the Sexton house simply would not sit serenely in the lap of plausibility.

It is true that this court has said that it is the duty of the trial court, in a homicide case presenting an absence of eyewitnesses, to instruct the jury to return a verdict in favor of the defendant, provided always that the physical facts in the evidence have corroborated the testimony of such defendant and provided further that the proven circumstances were more consistent with such defendant's innocence than with his guilt. Dixon v. Commonwealth, 290 Ky. 469, 161 S. W. 2d 913; Carpenter v. Commonwealth, 287 Ky. 819, 155 S. W. 2d 240. But if the physical facts did not corroborate the defendant's testimony but, on the contrary, contradicted it, then it was the trial court's duty to refuse to direct a verdict for such defendant   Prince v. Commonwealth, 303 Ky. 15, 196 S. W. 2d 872.

In the instant case, the physical facts did not corroborate Sexton. They contradicted him. The proven circumstances of this case were not more consistent with Sexton's innocence than with his guilt. Therefore, the trial court correctly, we believe, refused to direct a verdict in favor of Sexton, correctly, we consider, submitted this case to the jury for its decision.

2. Appellant also urges on this appeal that the judgment in this case should be reversed because of improper argument by the Commonwealth Attorney upon this trial.

The record discloses that the Commonwealth Attorney, in his argument to the jury, made comments concerning the failure of Sexton's wife, jointly indicted with him but not on trial with him, to testify, also made com-

ments concerning the failure of Sexton's niece, indicted as an aider and abettor, to testify in Sexton's behalf.

We believe that this type of argument was improper under all the circumstances and that probably it was prejudicially so in this particular case.

Where witnesses, not testifying on a trial, would have been incompetent or would have testified only as to immaterial or irrelevant matters, if they had been offered as witnesses, the failure of the accused to produce such witnesses should not be made the subject of unfavorable comment by the prosecuting attorney. 53 Am. Jur. 382. Sexton's wife, not on trial in her own case, could not have been compelled to testify as a witness against him. See Sec. 606, Ky. Civil Code, as amended by Acts of 1940, c. 95. Sexton's niece, if she did not actually see this tragedy, as claimed by Sexton, could not have testified on this trial as to anything material or relevant pertaining to this case. Therefore, we believe that this kind of argument on the part of the Commonwealth Attorney was improper in this case.

The record also discloses that the Commonwealth Attorney, in the course of his argument to the jury, placed a chair out in front of the jurors and then argued that if the deceased child were present and were giving its own testimony from that empty chair, such testimony would show that the child was killed in the woods near the Sexton home by a back handed blow with the butt of Sexton's shotgun and also by the shotgun blast that then followed at the hands of Sexton; that the child would have shown that it was then carried to the Sexton home and that the reason Sexton had become angered was because of the refusal of the father of this child to buy the Sexton place and that Sexton had, after meditating upon this refusal, ejaculated in his frustration, ''Oh hell,'' and then killed the child in the manner related.

This type of argument was not only imaginative and fanciful, but it had the effect of assuming an impossible situation for this jury to consider, the situation of a three year old child outlining in cogent testimony the details and motives of its own killing at the hands of the accused on trial. We believe that this was going beyond the bounds of propriety, probably with prejudicial results against appellant Sexton.

It is fundamental that the argument of counsel should at all times be confined to the questions in issue and the evidence relating thereto adduced at the trial and to such inferences, deductions, and analogies as can reasonably and properly be drawn therefrom. 53 Am. Jur. 386.

Argument of counsel should be limited to matters within the record or to fair and reasonable deductions arising from the record. Louisville & N. R. Co. v. Baker's Adm'r, 183 Ky. 795, 210 S. W. 674.

Argument of counsel must not arouse passion and prejudice, must be pertinent to law, and consistent with facts proven or inferences therefrom. City of Providence v. Young, 227 Ky. 690, 13 S. W. 2d 1022.

In the instant case, it is clear that the prosecuting attorney's argument went outside the record, climbed the stairway of speculation, went beyond reasonable inferences deducible from any evidence produced, fancied an illusionary situation in such dramatic and realistic fashion as to arouse a probable prejudice in this jury against appellant Sexton on this trial.

Therefore, it is our belief that these arguments of the prosecuting attorney constituted errors which prejudiced the appellant's substantial rights and that accordingly the judgment will have to be reversed and this case remanded for another trial.

It is not necessary at this time for us to consider in detail the other errors of which complaint has been made. It is sufficient, we believe, to say that the trial court was substantially correct in its rulings as to admissibility of offered evidence and that it was also substantially correct as to the instructions given to the jury upon the final submission of the case for the jury's verdict.

Wherefore, for the reason herein indicated, the judgment of the trial court is reversed for further proceedings consistent herewith.