Rodney T. BIXLER, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2004–SC–000215–MR.

Supreme Court of Kentucky.

Aug. 24, 2006.

Rehearing Denied Nov. 22, 2006.

Randall L. Wheeler, Assistant Public Advocate, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Michael Harned, Assistant Attorney General, Office of Attorney General, Samuel J. Floyd, Jr., Assistant Attorney General, Office of Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice ROACH.

Appellant, Rodney T. Bixler, was convicted of murder and theft by unlawful taking over $300. On appeal, he raises only two claims of error: (1) that the trial court erred by allowing the prosecution to question him about, and comment during argument on, his wife's failure to testify for him; and (2) that the prosecutor repeatedly misstated the evidence during closing argument. Finding no merit in these claims, we affirm.

## I. Background

On October 21, 2000, Appellant went to a bar in Lawrenceburg, Kentucky with several people, including a woman named Daisy Whitaker. The group left the bar around midnight to go to a party at a private residence. At the party, Appellant and Whitaker talked and danced together. Some time later, Appellant and Whitaker left the party together in Whitaker's car. Two other people—Roberta Ragland and Mitchell Cunningham—left the party at the same time. Ragland and Cunningham followed Whitaker's car for a short time until it turned toward Whitaker's house. Neither Cunningham nor Ragland saw the other couple arrive at Whitaker's house.

Early the next morning, Whitaker's car was found abandoned near an apartment complex in Lexington, which is about a thirty-five to forty-minute drive from Lawrenceburg. The police officer who found the car recalled having first seen it at approximately 4:00 a.m. A small crowd was gathered around the car, but the crowd quickly dispersed when the officer drove up. When he approached the car,

he noticed that its windows were down and the keys were still in the ignition. The officer checked the glove box and found the bill of sale, which showed the name and address of the owner. He then reported the car to the Lawrenceburg Police Department and had the car towed to an impound lot. At approximately 7:00 a.m., Officer Greg Boblitt and another officer of the Lawrenceburg Police Department went to Whitaker's residence to check on her in response to the report about her car having been abandoned. No lights were on and the doors were locked. No one answered the door, so the officers assumed no one was home and left.

Amanda Hayes, Whitaker's granddaughter, also lived in the house, but she was not home when the police visited early that morning. Hayes returned home approximately four hours after the police visit. She found Whitaker dead and called 911.

Officer Boblitt returned to the scene, where he found the body naked and lying face-down in the bathtub. The County Coroner pronounced the victim dead at the scene and attended the autopsy performed by the medical examiner the next day. From the autopsy, the medical examiner found that Whitaker had died of asphyxia from strangulation or suffocation. She also found that Whitaker had bruises and abrasions on her neck, eyes, mouth, shoulders, arms, feet, torso, and left knee.

Appellant claimed he learned of Whitaker's death a couple of days later. He contacted the police, claiming he had information about the night of Whitaker's death. He called one of Whitaker's relatives and expressed sorrow over her death. On October 24, 2000, he gave a statement to the police in which he admitted having been with Whitaker the night she died and having visited her residence. He claimed that at approximately 2:00 a.m. on October 22, 2000, after leaving the party at the

private residence, he and Whitaker had gone to her house and had consensual sex. He claimed that Whitaker had wanted him to spend the night, but that he had wanted to go home, so she drove him to his wife's house. He got out of the car and watched Whitaker drive away, claiming that was the last time he saw her. He noticed that his cell phone was missing, so he walked a short distance to his parent's house to call his wife. He then walked back to his wife's house, where he changed his five-month old son's diaper and fell asleep across the foot of his wife's bed.

Appellant also claimed during the interview with the police that he met Whitaker on another occasion several weeks before her death, that he had gone home with her then, and that he knew of Whitaker through his father, who had been "with" the victim, implying that they had been in a sexual relationship.

Despite Appellant's claim that he last saw Whitaker alive and well, the investigation quickly focused on him. Two pubic hairs recovered from the victim's car—one from a fitted bed sheet found in the car and one from the door jamb—were similar to Appellant's hair. DNA testing of the hair found in the door jamb indicated it came from Appellant. More hair, along with blood and semen stains, was found on bed sheets in Whitaker's home, though this hair did not match Appellant's, and DNA testing indicated that the blood and semen on the sheets did not match Appellant. No blood was found on the shoes and clothing collected from Appellant during the investigation. DNA testing of semen from a vaginal swab of the victim indicated that it matched Appellant. A pillow with blood on it was found in the victim's car. Two pairs of panties were found in the bathroom near the victim's body. These garments were turned over to the forensics lab, which did not test them. Fingernail clippings were taken from the victim, but they were never tested because no scratches had been found on Appellant (or any other suspect).

Prior to trial, Officer Mike Schell, the police officer leading the investigation interviewed Appellant's wife, Stephanie Bixler. At trial, Officer Schell testified that Ms. Bixler had given him a statement in which she claimed her husband had come home in the early morning hours of October 22, 2000. Appellant's attorney did not object to this testimony. In fact, on cross-examination, Appellant's attorney questioned the officer further about Ms. Bixler's statement. Officer Schell again stated he had taken a statement from Ms. Bixler and that she claimed her husband came to her house early in the morning on October 22, 2000. Officer Schell also testified about his interview with Appellant.

Several other witnesses, including Roberta Ragland and Mitchell Cunningham, testified as to the events the night of Whitaker's death, including the activities at the bar and the party at the private residence. Ragland also testified that the victim had had several Hispanic boyfriends. She stated while she had never seen any of these boyfriends hurt the victim, in the early summer of 2000, she had seen the victim with bruises. She had also heard that the victim had fought with one of her boyfriends and that one of the victim's boyfriends had forced her to drive to Lexington and caused her to wreck her car. She also testified that in 2000, some of the victim's neighbors had threatened to burn down the victim's house.

The Lexington police officer testified at trial about finding the victim's car in Lexington.

Two women, Ashley White and Vickie Warren, testified that in the early morning of Sunday, October 22, 2000, they saw Appellant in Lexington in the area where the victim's car was found abandoned.

Both women admitted to being convicted felons and to having used drugs that night. White testified that she actually saw Appellant two times, once at approximately 9:30 to 10:00 p.m. on Saturday night and again at approximately 7:00 am on Sunday morning. She stated that Appellant was in a green sedan, that she had at one point been in the car with Appellant and several other people, and that Appellant told her there was $500 in cash and eight ounces of crack cocaine in the car. Prior to trial, White picked Appellant's picture out of a photographic line-up. She testified at trial that she was familiar with Appellant because he had dated her cousin.

Warren's testimony contradicted White's testimony in some respects. She stated that she was with Ashley White and another friend at a crack house in the early morning of October 22, 2000. She claimed that Appellant approached them at around 4:00 a.m. and asked for a ride to his car. They drove Appellant in a white car to the parking lot where he claimed to have left his car, but it was missing. They then returned to the crack house, and Warren left soon thereafter. Warren admitted that she was a prostitute and a "crackhead" at the time.

The Commonwealth also presented the testimony of Thomas Ellison, who had been in the Franklin County Jail with Appellant in December 2000. Ellison testified that Appellant discussed the murder of a woman in Lawrenceburg, claiming that Appellant said that "he had been f—ing around with her," that "he killed the bitch," and that he had been having marital problems. Ellison testified that Appellant specifically said, "I killed the white bitch in Lawrenceburg. My daddy used to f—her. She wasn't nothin' but poor trash." On cross-examination, Appellant's attorney asked Ellison if he had spoken with another inmate while in the Franklin County Jail about concocting a story about

Appellant in order to get out of jail. Ellison denied doing so.

Bill Corn, a former co-worker of Appellant, testified about his contact with Appellant after the murder. He stated that when he spoke with Appellant in the week following the murder, Appellant claimed to have seen him driving on the Bluegrass Parkway on the morning of October 22, 2000. (The Bluegrass Parkway runs south of Lawrenceburg to Lexington.) Corn remembered telling Appellant that this was impossible because he had been in Illinois at the time. Corn also testified that he overheard Appellant on the phone with his wife while at work. Corn claimed that Appellant told his wife: "What are they doing there?"; "You're not supposed to talk to them."; and, "Tell them you let me in the house and I just laid across the bed."

In response to Thomas Ellison's testimony, Appellant offered the testimony of Charles Peffer, who had been in the Franklin County Jail with Ellison. Peffer testified that while in jail, Ellison had tried to convince him to help fabricate a story about Bixler so that they could get out of jail early or get a bond reduction.

Appellant also took the stand and testified in his own defense. He denied killing the victim and stealing her car. He also denied being in Lexington on the night of October 21, 2000 or the morning of October 22, 2000. He testified in conformity with his prior statement to the police about the time he spent with the victim immediately prior to her death and what he did after he claimed to have left her.

The jury convicted Appellant of murder and theft by unlawful taking over $300. He was sentenced to twenty-five years for the murder and four years for the theft, to be served consecutively for a total of twenty-nine years in prison. He appeals to this

Court as a matter of right. Ky. Const. § 110(2)(b).

## II. Analysis

### A. Spousal Testimony Privilege

█ Appellant claims that the Commonwealth's Attorney's repeated discussion of Ms. Bixler's failure to testify amounted to improper commentary on the spousal testimony privilege found in KRE 504(a). The spousal testimony privilege was discussed several times during the trial.

The issue was first mentioned when Appellant testified. During cross-examination, the prosecutor asked Appellant about his claimed alibi, which had been supported in part by the statement that his wife had made to the police. The exchange between the prosecutor and Appellant began as follows:

Prosecutor: And you told police that you got home at 2:30 in the morning, around 2:30 in the morning?

Appellant: I didn't tell him at 2:30. I told him it might could have been, it was a possibility. I couldn't swear to it.

Prosecutor: And you told police when you went into your wife's house, she was already there asleep?

Appellant: Yes, sir.

Prosecutor: And then you told police you didn't leave again until the next day, right?

Appellant: Yes, sir.

Prosecutor: So the only person that can testify your whereabouts is your wife?

Appellant: I don't know, I don't know.

Prosecutor: You don't know?

Appellant: No.

Prosecutor: Well, was anybody else in the bedroom with you?

Appellant: No.

Prosecutor: So, the only person who knows where you were after 2:30 in the morning is your wife, right?

Appellant: I don't really know. I don't know if—there's a possibility her mother knew, it's a possibility that her father knew, it's a possibility that her cousin that lives right across the street knew. I can't say. I don't know.

Prosecutor: But your wife knew you were there?

Appellant: Yes, sir.

Prosecutor: But she's not going to testify?

Appellant: No, I don't think she is.

Prosecutor: Isn't it true she's not going to testify because she doesn't want to lie again like she did to the police?

Before Appellant could answer this question, his attorney (designated "Def. Atty." below) asked to approach the bench. The judge replied, "You may." Appellant's attorney and the two prosecutors moved to the bench for a bench conference out of the hearing of the jury. They engaged in the following exchange:

Def. Atty.: That's totally improper and Mr. Hoffman knows that.

Judge: How do we know she lied, just curiously?

Prosecutor: Because she wasn't there. Her cell phone records show that she was out using her phone all night. She was not asleep there at the house.

Judge: But that's not in evidence.

Prosecutor: No.

Def. Atty.: First of all, we don't have any properly certified cell phone records.

Judge: I was going to say, that is not in evidence.

Prosecutor: Yes, we do.

Judge: But they're not in evidence.

Prosecutor: No, and I haven't mentioned them.

Judge: Now, let's be careful here. I mean, all's I'm saying is how can we characterize something to the jury that's a lie, that hasn't been established?

Prosecutor: I'll withdraw the question. I think it might be argumentative. I'll go back—

Judge: Well, that's just number one. I mean, all's I'm saying is it's not, I mean, if it had been proven and established, I think you could characterize it, but it's just totally out of the blue. I mean, nobody's offered any of this stuff in evidence.

Prosecutor: Well, I think I might also go back, I mean part of our reason for putting Bill Corn on was to show that he had dictated to his wife what to tell the police and—

Judge: Well, if you've got that and he—

Def. Atty. If that's your argument.

Judge: Yeah, he attempted to explain it, but you're right. I didn't say anything. I'm just suggesting now, that this characterization, I don't want to do anything about it, I just want to say that there's no way—

Prosecutor: I'll move on.

Judge: So I think you just need to kind of clean it up a little—

At that point, no mention had yet been made of the spousal privilege. Immediately following the judge's instruction to "clean it up a little," Appellant's attorney started the following exchange:

Def. Atty.: And, Judge, you know his wife I think has a right to choose to exercise her privilege not to testify. I don't really think that's a proper subject for them to be commenting on and I would object.

Prosecutor: I would state this. She doesn't have a privilege. He has the privilege to assert against her. Not vice-versa.

Def. Atty.: No, I don't think you're right about that, Mister—

Judge: Well, *we haven't talked about privilege.* That's number one. Missing witnesses can be commented on in argument both ways. Now, that's the rule and everybody's aware of that *and so we really haven't discussed privilege.*

Prosecutor: And I'll back up and I think—

Judge: I don't want to give any admonitions in this case.

Def. Atty.: No, I'm not asking you to do that.

Judge: I know you're not. I think sometimes I do it. I pride myself on giving clear and offensive admonitions. I either offend one side or the other. I don't want to give any admonitions. But what I'm saying is that's why I'm watching the stuff minutely, not letting myself be backed into what I feel like I've got to clean something up. So clean it up, retract it so that they know you're retracting that characterization. Because it has to be retracted.

Prosecutor: I'll just tell them I'm going to characterize that a different way and I'll—

Judge: That's good. That's all it takes.

(Emphasis added.)

After this bench conference, the prosecutor continued with his cross-examination as follows:

Prosecutor: Let me characterize that differently. Isn't it true she doesn't want to testify because she doesn't want to testify in here to the same thing she told the police, because that's what you told her to tell the police?

Appellant: No, I can't speak for nobody else.

Prosecutor: Well, she's your wife. Surely you've had conversations with her about this?

Appellant: No, we don't talk about it.

Prosecutor: She made a statement to the police about your whereabouts. Is that correct?

Appellant: Yes, sir.

Prosecutor: I mean, she would be your alibi witness for this murder, correct?

Appellant: Yeah, but I can't speak for her.

Prosecutor: She's not going to testify?

Appellant: No, I can't speak for her. My wife's a real, real nervous type person and I am too.

The prosecutor paused for about a minute, and then moved on to another subject. Appellant's attorney did not object to this recharacterized questioning, even though it still clearly addressed the fact that Appellant's wife was not going to testify.

The spousal privilege was next mentioned during the closing argument of Appellant's attorney. During his argument, Appellant's attorney noted that Appellant's wife had told a police officer that Appellant had come to her house the morning of the murder. He then argued that Bill Corn, from whose testimony it could be inferred that Appellant asked his wife to lie, had been mistaken about what he heard. Appellant's attorney then began to speak about Appellant's wife, stating, "Now, Mr. Bixler's wife, Stephanie Bixler," when the judge interrupted him and asked both attorneys to approach for a bench conference. The judge began their discussion:

Judge: You know, again, I was worried. I've been looking at the rules. I just wanted to make sure you were all aware of a specific Rule of Evidence.

The judge showed the attorneys an open book, presumably containing the KRE provision he had just mentioned,[1] and then continued:

Judge: And I've danced around it. Because I—you all have never asked me to. I didn't [unintelligible]

Prosecutor: It's prohibited.

Appellant's attorney nodded his head in agreement as the prosecutor spoke.

Prosecutor: I was aware of its—

Judge: Okay, good. I just didn't want to make sure that my implication was that I had somehow ruled that this rule wasn't in effect.

Def. Atty.: No, Judge. I'm—

Judge: That's fine. I wasn't going to worry about it. This was just my opportunity to make sure I don't back you into a corner. I just didn't want to let you misconstrue what I had said.

Prosecutor: No. I wasn't going to talk about privilege. I'm talking about the witness.

Judge: Okay. That's fine.

Appellant's attorney nodded his head in agreement again, and then returned to his closing argument. He then launched into a discussion about the prosecution having made a big deal about Appellant's wife not testifying. He noted that if she had testified, she likely would have testified in conformity with her statement to the police. Appellant's attorney also noted that the prosecution had the option to call Appellant's wife to testify but had failed to do so.

The privilege was next discussed during a bench conference on another issue during the prosecutor's closing argument.

---

1. Although the specific Rule of Evidence in question was not mentioned at the bench conference, the context of the discussion indicates that it likely was KRE 511(a), which prohibits commentary about a claim of privilege by the judge or an attorney.

Judge: This brings me back to this other point that's been concerning me all along. It's what I have been pointing out to both of you all along here, and I've been trying get it more concisely. It talks in here about—and I don't know if you all are [unintelligible] it because of the ex—I think we need to clear this up. It is improper for the prosecution to argue that the defendant's failure to call a witness whose testimony is privileged—okay, just, well.

Def. Atty.: Well, her testimony would be privileged, Judge.

Judge: But, he talked, *he never invoked the privilege because he explained he didn't want to,* and maybe the explanation—

Defense: And if they had called her, you know, maybe nobody ever would have.

Prosecutor: All I'm saying is she was never called. She—

Judge: I know that, but what I'm just saying is I just want to make sure that we dance around this issue. I have *ruled the way I've ruled* and let you make those comments because Mr. Bixler made an alternative explanation. The issue was nervous. Now, *we've never talked about the privilege,* but I think we have to be really careful because I think some of these items are preserved. Mr. McDaniel may or may not agree with what's going on here, but some appellate review might decide that. I think we have to be very careful about this

Prosecutor: I'm not mentioning privilege or even alluding to it

Judge: I know you're not, but it's a little bit broader-based than that.

Def. Atty.: Well, Judge, in view of that, I would object, and I would ask the Court to admonish the jury that they should disregard any comments.

Judge: Well, then I have to talk about this. It talks about the admonition in here relative to that. And we'll look at it after you're done. How close are you?

Prosecutor: Probably within ten minutes, fifteen minutes.

Judge: Okay, make sure that on these items that weren't tested you explain to them that they weren't tested because there wasn't anything found.

Def. Atty.: And, Judge, and I can do this after he finishes but I'm going to ask for an admonition that they have the burden of proof in this case, and I think we're getting buried

Prosecutor: That's in the instructions already. Beyond a reasonable doubt, and an admonition just, that increases it, you can't get in

Judge: I don't know if I'm going to give another beyond a reasonable doubt admonition. I might remind the jury of their duty to adopt reasonable inferences and—

Prosecutor: The law is there and—

Judge: We're going to talk a little bit about it before they go back because I saved my lengthy statement to the jury. I didn't give it as I usually do. It's about a five-page statement that the AOC has drafted for Judges to read to a jury, and I didn't do it to see what few things I might have to say

Defense: And, Judge, let me further object to his argument about all these witnesses that we didn't call. These witnesses were equally available to the Commonwealth. They had every opportunity to call them, and I don't think that's the proper argument

Prosecutor: It's a missing witness. They talked about them. They could establish where he was, and it's a reasonable comment, and I can say

they did not testify and that's all I've done.

Def. Atty.: They were equally available to them

Prosecutor: So? That's your problem

Judge: Yeah. Well, it hasn't shifted the burden any—this is an interesting—we've got to be really careful so we—I mean we don't want to have a good trial and have it sunk because of closing.

Def. Atty.: And I haven't been able to jump up at everything, I mean Dr. Roth never even examined those pills that he said that she examine. I mean, really, really—

Judge: Well, I explained to the jury what I'm supposed to allow for argument, that's what it is—argument. And there's a certain latitude in argument. As long as we stay away from those issues that are—you know, I mean, reviewing Courts are going to—there is latitude and I just want to be really careful and each time if you'll go back, it just cleans the latitude issues up. I mean, I think it's okay.

(Emphasis added.)

The privilege was mentioned again after the prosecutor's closing argument in the context of the following discussion:

Def. Atty.: Judge, in addition to the matters that I have raised earlier, Mr. Ballard later, just at the end of his argument, stated that Mitchell Cunningham had warned Daisy Whitaker about going home with Rodney [unintelligible] he's bad. There was no testimony that I heard to that fact.

Prosecutor: I wrote it down, quote.

Judge: Well, I mean, I may or may not remember that Mitchell Cunningham told her to go home, but I mean, you can look at the record

Def. Atty.: There were some things that were in his statement that were testi-

fied to and that wasn't even in the statement.

Judge: I mean, we would, the only thing the jury would have heard would have been his testimony.

Def. Atty.: Yes.

Prosecutor: And that's what I referred to.

Judge: I mean—

Def. Atty.: There was no testimony about that.

Prosecutor: I said from—well, you can go back and look at it. But it was there and I told him that he's, he testified to that. We wrote down what he said.

Judge: Well, I mean, I don't have any independent memory of whether or not it was said. If it was said, then everything you've said about it is a reasonable inference that can be drawn from the evidence. If it wasn't said, if Mitchell Cunningham didn't say that, then I've got a problem.

Def. Atty.: [unintelligible]

Judge: That's all, that's by Mr. Ballard's, you know I've followed along and—

Prosecutor: It's the same thing with—

Judge: I've cleared a couple of the things up that I thought along he articulated the Commonwealth's position in the case within the context of reasonable inferences he felt could be drawn from the evidence, whether or not the jury—the jury is not going to try this case on the closing arguments.

Def. Atty.: No, sir. And, I thank God.

Judge: And I don't really [unintelligible]. Again, I expressed some issues about latitude, and we got up to some edges, but we never fell right off into any of those errors that have classically been problems, you know. So, if this case, and Mitchell—and this is

absolutely not true, and I suggest that during lunch you review Mitchell Cunningham's testimony.

Prosecutor: That's not Mitchell's, Roberta Ragland.

Judge: Okay. Or whoever. That Mitchell Cunningham said that. Then I think that could be cleared up by an admonition. Now, I do not really think that anything presented itself in order for me to declare a mistrial. *I want to point out also that on this—I mean, I'm dancing around it, and we have danced around—there was never any point in which Rodney Bixler or his wife invoked the privilege.*[2]

Prosecutor: That's correct.

Def. Atty.: It wasn't necessary.

Judge: I didn't say it was. I'm just saying. So the comments that were made about her not testifying were appropriate inferences to be drawn from the evidence about Rodney Bixler's testimony about why she didn't testify. So, I really never think we got into that. *If there had been a formal invocation of the privilege,* then I think we wouldn't have been able to mention her name in closing. Okay? You see what I'm saying?

Def. Atty.: Yes, sir.

Judge: But because *it was never invoked,* and that's why I was kind of bringing it up, I felt uncomfortable. You all had had some maybe even discussions that I wasn't familiar with about her as a witness.

Prosecutor: The only discussion, we came one time up here at the bench and that was the only mention ever made.

Judge: Okay. Well, that's the first I heard. But no problem. But what I'm saying is *my rulings were predicated upon the fact that the privilege was never invoked* and whether or not that's good enough to allow it to be commented on is an issue for the appellate courts because the Kentucky case law indicates that the privilege shouldn't be commented on, the failure of the witness to testify shouldn't be commented on, *but it all is graced with the issue of the invocation of the privilege.*

Def. Atty.: Judge, I think there's some cases where if a witness is equally available to the Commonwealth they're not allowed to comment. That's why I think they were wrong to do that also.

Judge: Well, certainly there is that concern about trying to attempting to shift the burden. I mean, they presented their evidence through her statement. You both touched on that in your argument. That was the evidence. And as you said in your closing argument, that established an alibi. So after that of course everybody's going to, from their tactical positions, argue their positions about why they chose to present that bit of evidence the way they presented it. So, again—

Prosecutor: And Mr. McDaniel made the comment that they were available for our subpoena power or call as witnesses

Judge: Either one of you could have called her and maybe neither one of you wanted to touch her because of, I

**2.** We have included the extended discussion leading up to this mention of the privilege to show the context of Appellant's motion for a mistrial. In his brief to this Court, he claims that the privilege issue was the basis for the motion. However, the exchange reproduced above indicates that the motion for a mistrial was based on Appellant's allegation that the prosecutor had misstated the testimony of several of the witnesses, which is the basis of the other issue that Appellant has raised in this appeal.

don't know. You know what I'm saying? I mean, it was a tactical, the jury will decide whether or not that matters.

Prosecutor: That's correct

(Emphasis added.)

The judge then returned to the issue of the defense motion for a mistrial based on the prosecutor's alleged mischaracterization of the evidence. The judge also allowed Appellant's attorney to make belated motion for a directed verdict. Both motions were denied. The spousal testimony privilege was not mentioned again.

Our rules grant what is known as the spousal testimony privilege or the adverse testimony privilege:

> The spouse of a party has a privilege to refuse to testify against the party as to events occurring after the date of their marriage. A party has a privilege to prevent his or her spouse from testifying against the party as to events occurring after the date of their marriage.

KRE 504(a). It is improper for an attorney comment on the claim of the privilege: "The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom." KRE 511(a).

Our focus in discussing this issue is whether the spousal testimony privilege was invoked so as to allow Appellant to enjoy the protections of KRE 511(a).[3] The Commonwealth's Attorney twice discussed the failure of Appellant's wife to testify—first during cross-examination of Appellant and later during his closing argument. During the cross-examination, Appellant's attorney objected to the questioning and mentioned the existence of the spousal testimony privilege. The trial judge raised the issue independently three other times, including during and at the end of the Commonwealth's closing argument. The judge made clear that he was aware of the prohibition in KRE 511(a) on commenting on the claim of a privilege. But as the judge noted repeatedly, neither Appellant

**3.** Though the parties have not raised the issue, we note in passing that KRE 511(c) provides: "Upon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom." Appellant's attorney never asked for such an instruction, although we regularly require litigants to request a limiting instruction or admonition in order to preserve an error. *E.g., Ernst v. Commonwealth*, 160 S.W.3d 744, 759 (Ky.2005) ("Appellant never objected to the admission of any of this testimony at trial, much less requested a limiting admonition. We have held that such admonitions are required only 'upon request' and that the failure to request an admonition is generally regarded as trial strategy. Certainly, we would not expect a trial judge to *sua sponte* admonish the jury to give a limiting effect to evidence to which there was no objection. The failure to give an unrequested limiting admonition is not palpable error." (citations omitted)); *Soto v. Commonwealth*, 139 S.W.3d 827, 861–62 (Ky.2004) ("Appel-lant did not request an admonition to the jury to disregard the evidence; thus, no error occurred. Absent countervailing evidence, the failure to request a limiting admonition is regarded as a trial tactic, intended to avoid calling further attention to the improper evidence."). However, the error alleged here is not that the jury drew an adverse inference against the Appellant, but that the prosecutor improperly commented on the privilege. KRE 511(c) is designed to allow a party to attempt to prevent the jury from drawing an adverse inference from the exercise of a privilege. But as Professor Lawson notes, the rule also includes the right "to have jurors ... not instructed if an affected party desires to have no attention drawn to the privilege claim ...." Robert G. Lawson, *Kentucky Evidence Law Handbook* § 5.30[2], at 397 (4th ed.2003). It would make little sense to require a party to request an instruction drawing attention to the exercise of a claim of privilege where the underlying allegation of error hinges on the other party improperly drawing attention to the claim of privilege.

nor his wife ever expressly invoked the spousal testimony privilege, thus the privilege, and its incumbent protections, had never been presented squarely to the court. Rather, the issue that the judge addressed was the prosecutor's comment on the fact that Appellant's wife, by not appearing at trial, was a missing witness. In so making these comments, the judge was inviting Appellant's attorney to indicate whether Appellant had chosen to exercise his privilege. Appellant's attorney, however, did not accept that invitation, thus there is no evidence in the record that Appellant asserted his privilege to prevent his wife from testifying.

The closest Appellant or his attorney came to invoking the privilege was the first mention of it, when the attorney stated as part of his objection to the prosecutor's questioning that Ms. Bixler had "a right to choose to exercise her privilege not to testify." When the prosecutor then suggested that the privilege belonged to Appellant, rather than his wife, Appellant's attorney claimed this was a mistaken interpretation of the law.[4] In light of this subsequent discussion, it is clear that Appellant's attorney's initial mention of the privilege cannot constitute an invocation of Appellant's privilege to prevent his wife from testifying. Appellant also asserts that his wife exercised the privilege by deciding not to testify at trial, although there is no evidence in the record that she ever invoked the privilege or actually chose not to testify.

■ We have previously held that a party-spouse cannot exercise the privilege of

his spouse not to testify. *See Pate v. Commonwealth,* 134 S.W.3d 593, 600 (Ky. 2004) ("[W]hether or not the trial court erroneously refused to allow [Appellant's wife] to assert her privilege is immaterial; it was her privilege that she was attempting to assert, not his. Appellant had every opportunity to assert his own adverse testimony privilege under KRE 504(a) in order to prevent his wife from testifying against him. Appellant made no effort to do so; thus, Appellant's failure to assert his own privilege precludes review of this issue. In essence, Appellant contends that the trial court's denial of [his wife's] spousal testimony privilege was somehow a violation of his rights. We fail to see how Appellant has standing to assert his wife's privilege, and Appellant does not offer any authority in support for this proposition."). Just as in *Pate,* Appellant's attempt to claim the protection of his wife's spousal testimony privilege must fail. A party-spouse has no standing to claim the protection of the witness-spouse's privilege not to testify. Appellant must rely instead on his own privilege.

Appellant makes a similar claim regarding the exercise of his privilege. He argues that his decision not to call his wife to testify, as evidenced by the fact that she did not testify, was sufficient to constitute an invocation of the privilege. Appellant cites a single case, *McFarland v. Bruening,* 299 Ky. 267, 185 S.W.2d 247 (1945), for the proposition that merely failing to call the spouse as a witness constitutes an assertion of the privilege. Appellant's reli-

---

4. In fact, both the prosecutor and Appellant's attorney incorrectly described the law of the spousal testimony privilege in Kentucky. Appellant's attorney correctly stated the law of the spousal testimony privilege as it existed before the adoption of the Rules of Evidence. But KRE 504(a), as adopted in 1992, expanded the spousal testimony privilege so that it now applies to both spouses: a witness-

spouse may avoid testifying against the party-spouse, and the party-spouse may prevent the witness-spouse from testifying adversely to the party-spouse. *See* Robert G. Lawson, *Kentucky Evidence Law Handbook* § 5.10[3], at 367 (4th ed. 2003) ("The prerogative provided by KRE 504(a)—to preclude adverse testimony—belongs to both spouses.").

ance on *McFarland*, however, is entirely misplaced as the case's only discussion of the spousal testimony privilege is to note that, as of 1940, "a husband or wife is now a competent witness for the other...." *Id.* at 270, 185 S.W.2d at 250. *McFarland*'s only effect was to note that the law of spouses as witnesses had changed so that the rule of absolute incompetency of either to testify for or against the other was no longer in effect.

But if Appellant indeed intended his failure to call his wife to be an exercise of his privilege, we simply cannot approve such a passive-aggressive litigation tactic, even when Appellant's liberty is at stake. Under such a construction of KRE 504(a), whether a defendant had exercised the privilege would never become clear until the close of the defense's evidence. This creates a serious notice problem both for the court and the prosecutor, and would allow the defendant the advantage of limiting the prosecutor's opening statement and questioning of witnesses by simply doing nothing. Ultimately, were we to accept Appellant's claimed exercise of his privilege, the necessarily resulting rule would be that the party-spouse's adverse testimony privilege is in effect by default unless expressly waived by the party spouse.

This, of course, leads us to the subtler issue of whether the invocation of the spousal testimony privilege is necessary in order to claim its protection, or put differently, whether the privilege is in effect automatically. In fact, Appellant's ultimate argument that his failure to call his wife to testify invoked his privilege, as wanting as it is, might as well be a claim that an express invocation of the privilege is unnecessary. Unfortunately, our decisions that approach this issue are inconsistent.

The primary support for the no-invocation thesis comes from *Sexton v. Common-* *wealth*, 304 Ky. 172, 200 S.W.2d 290 (1947), and *Gossett v. Commonwealth*, 402 S.W.2d 857 (Ky.1966). In *Sexton*, the Court held that it was prejudicial for the prosecutor to comment on the defendant's failure to call his wife to testify, relying on this general rule:

> Where witnesses, not testifying on a trial, would have been incompetent or would have testified only as to immaterial or irrelevant matters, if they had been offered as witnesses, the failure of the accused to produce such witnesses should not be made the subject of unfavorable comment by the prosecuting attorney. Sexton's wife, not on trial in her own case, could not have been compelled to testify as a witness against him. See Sec. 606, Ky. Civil Code, as amended by Acts of 1940, c. 95.

304 Ky. at 177, 200 S.W.2d at 293. In *Gossett*, the defendant's wife did not testify, and the prosecutor commented on this fact. There is no indication that the defendant invoked his spousal testimony privilege, yet our predecessor court held:

> It is written in KRS 421.210 (old Cr. Code 606) that 'neither (husband or wife) may be compelled to testify for or against the other.' Comments by the Commonwealth's attorney on failure of the wife to testify or failure of the husband to call the wife as a witness are improper, prejudicial, and have been consistently condemned by this court. Cf. *Sexton v. Commonwealth*, 304 Ky. 172, 200 S.W.2d 290 (1947); and *Coffey v. Commonwealth*, Ky., 256 S.W.2d 379 (1953).

402 S.W.2d at 858–59. *Gossett*'s reliance on *Sexton* is understandable, but its citation to *Coffey* as evidence of the consistent condemnation of the practice of commenting about the spousal testimony privilege is puzzling as the latter case stands only for the limited proposition that "neither

the husband nor the wife can be compelled to testify for or against the other" and recognizes that "the refusal so to do is the prerogative of the witness." *Coffey v. Commonwealth,* 256 S.W.2d 379, 381 (Ky. 1953).

It should be noted that *Gossett* and *Sexton* rely on a much older version of the spousal testimony privilege, one that differs significantly from the one currently embodied by KRE 504(a). The spousal testimony privilege, like the marital communications privilege, "originated as [a] common-law rule[ ] ...." Robert G. Lawson, *Kentucky Evidence Law Handbook* § 5.10[2], at 365–66 (4th ed.2003). It originally consisted of a pure rule of competency, or more accurately incompetence, as it prohibited spouses from testifying either for or against each other. It was codified as early as the first Code of Civil Practice adopted in 1851. *See* 1851 Code of Civil Practice § 568 ("The following persons shall be incompetent to testify: ... (4) Husband and wife, for or against each other, or communication made by one to the other, during the marriage, whether called as a witness while the relation subsisted or afterwards."). The same provision was included as Section 568 of the second edition of the Code of Civil Practice published in 1853, and as Section 670 of the Code of Civil Practice published in 1854 (the first year in which a complete Code of Practice for both civil and criminal cases was published). A slightly altered provision—"Neither a husband nor his wife shall testify while the marriage exists or afterwards concerning any communication between them during the marriage. Nor shall either of them testify against the other. Nor shall either of them testify for the other ...."—was included as Section 606 in later versions of the Civil Code of Practice. Section 606 was amended by 1940 Ky. Acts Ch. 95 to read: "In all actions between a husband and wife, or between either or both of them and anoth-

er, either or both of them may testify as other witnesses, except as to confidential communications between them during the marriage, ... and provided further, that neither may be compelled to testify for or against the other." This appears to be the privilege provision on which *Sexton* and *Gossett* were based. Section 606 was later codified as KRS 421.210(1), which has since been repealed, 1992 Ky. Acts. ch. 324, § .30 (effective July 1, 1992), and replaced by KRE 504.

Our more recent cases, most of which were decided since the adoption of the Rules of Evidence, contemplate that a person claiming the protection of the spousal testimony privilege must actually invoke it. For example, we have noted that "[t]he party invoking the marital privilege has the burden of proving its applicability ...." *Sanders v. Commonwealth,* 89 S.W.3d 380, 391 (Ky.2002). Explicit invocation would seem to be the most obvious avenue for proving the applicability of the privilege. And those cases that discuss the privilege almost always note the defendant invoked the privilege. *See, e.g., Slaven v. Commonwealth,* 962 S.W.2d 845, 852 (Ky.1998) ("[I]f Appellant's wife had been willing to testify against him, Appellant could have prevented her from doing so by invoking the privilege."); *Estes v. Commonwealth,* 744 S.W.2d 421, 425 (Ky.1987), *overruled in part by Slaven v. Commonwealth,* 962 S.W.2d 845, 852 (Ky.1998) (noting that the defendant "has invoked a statutory privilege"); *Miller v. Carter,* 500 S.W.2d 600, 600 (Ky.1973) ("Appellant's husband attempted to invoke the privilege of not testifying, when called by appellee, as provided by KRS 421.210(1) .... The court compelled him to testify."); *cf. Thurman v. Commonwealth,* 975 S.W.2d 888, 896 (Ky.1998) (noting that "there is nothing in this record to prove that the spousal privilege was ever asserted," but reaching the merits of the issue of alleged

improper commentary on the privilege because of a contemporaneous objection). This constant description of defendants "invoking" the privilege, while not dispositive of the issue, is at least evidence that it is the most appropriate, if not only, means by which a defendant can bring the privilege to the trial court's attention.

More convincing, however, is the fact that we have already read the KRE 504(a) spousal testimony privilege, which as noted above is quite different from the statute involved in *Gossett* and *Sexton*, as requiring active assertion before its benefits, which would include the right to bar commentary on its exercise, can be enjoyed. We held in *Pate v. Commonwealth:* "Appellant had every opportunity to assert his own adverse testimony privilege under KRE 504(a) in order to prevent his wife from testifying against him. Appellant made no effort to do so; thus, Appellant's failure to assert his own privilege precludes review of this issue." 134 S.W.3d at 600. Similarly, the Court of Appeals has held, in an opinion ordered published by this Court, that:

> The Rule states that the privilege may only be asserted by the person holding the privilege. [Appellant's wife] did not assert the privilege at the hearing, but chose to testify. Appellant did not assert the marital privilege at the time of her testimony. Thus, appellant cannot complain at this stage since he thereby waived the spousal privilege by not asserting it.

*White v. Commonwealth,* 132 S.W.3d 877, 882 (Ky.App.2004). Though *White* was specifically discussing the marital communications privilege, KRE 504(b), its holding that failure to assert the spousal privilege constitutes a waiver of the privilege is equally applicable to the spousal testimony privilege.

This interpretation is supported by the language of the privilege rules themselves.

The privilege of the witness-spouse is *"to refuse* to testify against the party ...." KRE 504(a) (emphasis added). The privilege of the party-spouse is *"to prevent* his or her spouse from testifying against the party ..." *Id.* (emphasis added). In describing the two aspects of the spousal testimony privilege, the rule employs active verbs, indicating that the privilege itself consists in doing some act or assertion that prevents the witness from testifying. Moreover, it is the *"claim* of privilege ... [that] is not a proper subject of comment ...." KRE 511(a) (emphasis added); *see also* KRE 510 ("A claim of privilege is not defeated by a disclosure which was ... (2) Made without opportunity to claim the privilege."). This emphasis on the *claim* of a privilege presupposes that a party-spouse or witness-spouse has actually done some act in order to assert the privilege. Thus, that the forbidden act is comment on the claim of the privilege, rather than the mere existence of the privilege, further reinforces this notion of requiring active assertion of the privilege. We conclude that a plain reading of these rules requires some form of affirmative invocation of the spousal testimony privilege before a defendant can enjoy its benefits.

In reaching this conclusion, we are cognizant of the fact that the spousal privileges, at least those not related to confidential communications within the marriage, should be strictly construed. *See* Robert G. Lawson, *Kentucky Evidence Law Handbook* § 5.10[2], at 366 (4th ed. 2003) ("Spousal privileges are designed to protect marital relationships and do so at a cost to the search for truth in the justice system. All courts tend to say that the privileges should be strictly construed and extended no further than the need to serve the narrow purposes for which they exist."). We note that our reading of KRE 504(a) as

requiring active assertion of the privilege conforms with the modern trend in requiring strict construction of those provisions giving rise to the spousal privileges.

In light of the foregoing discussion, we conclude that *Gossett* and *Sexton* are anomalous in our case law in that they rely on spousal privilege where the privilege has not been invoked. As likely as not, this is due to their reliance on the old Code of Practice, which had only recently been amended from an outright bar on spousal testimony to create a privilege against compelled testimony. We think the better approach is embodied in our more recent case law, specifically *Pate* and *White*, and a plain reading of the privilege rules. A party-spouse must assert or invoke the spousal testimony privilege on the record before he or she can claim the protections of the rule. No doubt, there will be some concern about the proper method for asserting the privilege. But it is clear that doing nothing is simply insufficient to invoke the privilege. Instead, assertion of the privilege can be handled like so many other evidentiary issues. A party-spouse who wishes to claim the benefits of the privilege simply needs to invoke it on the record and may do so at any time. For example, prior to trial, the privilege could be asserted through a motion in limine. Alternately, the party-spouse could wait until an appropriate moment during trial-perhaps when the witness-spouse is called to testify or when the other party begins to comment on the witness-spouse's failure to testify-to assert the privilege.

After all this discussion, we are left with the obvious question of why Appellant's attorney never invoked his privilege, especially when given so many opportunities to do so and when doing so would have been a simple matter of, well, speaking up. A close examination of the record quickly reveals a good candidate for the answer.

Appellant's attorney also wanted to be able to make comments about Ms. Bixler's failure to testify. The proof of Appellant's alleged alibi came in only one form: the testimony from Officer Schell about Ms. Bixler's earlier statement. In his closing argument, Appellant's attorney noted that the prosecutor made a big deal about Appellant's wife not testifying. In response, he claimed that had she testified, she simply would have testified in conformity with her statement to the police. Appellant's attorney then noted that the prosecution also had the option to call Appellant's wife to testify but had failed to do so. This last statement, taken at face value, indicates a waiver of the spousal testimony privilege in that Appellant's attorney admitted that the prosecutor could have called Ms. Bixler to testify. At the very least, it shows that Appellant never invoked the privilege since his attorney was stating that nothing prohibited Ms. Bixler from testifying.

More importantly, this portion of Appellant's attorney's closing argument shows that the decision not to invoke the privilege was strategic and therefore intentional. By not invoking the privilege, Appellant's attorney was free to comment on Ms. Bixler's failure to testify. This is why the trial judge noted repeatedly that he saw the substance of Appellant's objection not as privilege, but as about the proper scope of comment on a missing witness. Because the privilege had not been asserted, he allowed both sides to argue about why the other side had declined to call Ms. Bixler. Appellant's attorney took full advantage of this to point out that the prosecutor was free to call Ms. Bixler had he been truly concerned about the validity of her statement to the police. This, in turn, undercut the prosecutor's attack on Appellant's alleged alibi, thus allowing Appellant's attorney to bolster his client's alibi *without ever calling an alibi witness.*

This situation is further proof of why the spousal testimony privilege must be invoked before its protections may be enjoyed. If it does not have to be invoked, attorneys would be free to attempt what Appellant's attorney did, that is, to make competing, and indeed conflicting, claims about privilege in order to gain an advantage over the prosecutor. Though only a single level of the Court of Justice was faced with Appellant's conflicting claims, the principle underlying the classic formulation that a party "will not be permitted to feed one can of worms to the trial judge and another to the appellate court," *Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky.1976), is nonetheless at play. To hold otherwise, in the parlance of apt clichés, would allow Appellant to have his cake and eat it too.

Because Appellant never invoked his own privilege and cannot claim the benefit of his wife's privilege, the prosecutor's comments about Ms. Bixler's failure to testify were not error.

### B. Prosecutor's Closing Argument

■ Appellant also claims that the prosecutor was improperly allowed to misstate the facts several times during his closing argument. We begin by noting we have "repeatedly held that a prosecutor is permitted wide latitude during closing arguments and is entitled to draw reasonable inferences from the evidence . . . ." *Commonwealth v. Mitchell*, 165 S.W.3d 129, 132 (Ky.2005). We will address the prosecutor's alleged misstatements in light of this long-running legal principle, and in the order in which they appear in the prosecutor's closing argument.

■ The first claimed misstatement occurred when the prosecutor was discussing what Appellant had told Thomas Ellison.[5] When the prosecutor mentioned that Ellison claimed Appellant told him that his father had had sex with the victim, he also said, "and Rodney Bixler had told it to one other person in this case, Mike Schell." Appellant's attorney objected, arguing that Appellant had only made that statement to Ellison. However, in his statement to the police, which was taken by Officer Schell, Appellant claimed that his father had been "with" the victim. It is a reasonable inference, especially in closing argument, that this meant that Appellant's father had been in a sexual relationship with the victim. As such, the prosecutor did not misstate the evidence in this respect.

Nevertheless, the trial judge chose to admonish the jury that closing arguments did not constitute evidence in the case. He stated:

> Again, this is closing arguments. You are to decide the facts of the case. So listen. This does not supplant the evidence. This is the Commonwealth's argument. It should not take the place of the evidence you heard. You can use it to guide yourself to the evidence and understanding the Commonwealth's case. But you are to decide the facts of this case. Mr. Ballard isn't intending to tell you—to re-testify. He is making an

---

5. Though it has not been presented on appeal, Appellant's attorney objected at least one other time before this claimed misstatement. He objected when the prosecutor was discussing the testimony about Appellant being in Lexington and having drugs and money. We need not address the accuracy of the prosecutor's characterization of this testimony, since it has not been raised on appeal. We mention it, however, because, while the judge did not admonish jury, the prosecutor agreed to clarify that he was not giving evidence in closing. Immediately after bench conference, he told the jury, "You will remember the testimony. You will remember where it came from, and you will remember who said and how it was said and when it was said." The Commonwealth's brief mistakenly characterizes this statement as an admonition by the judge.

argument. So you are to consider the testimony and Mr. Ballard's argument. Appellant objected to another alleged misstatement of the evidence a few minutes later. Though this specific allegation has not been raised on appeal, we note it because after the bench conference on the objection, the judge again admonished the jury, stating: "Again, reasonable inferences from the evidence."

The next claimed misstatement occurred when the prosecutor was discussing pillows found at the scene. He noted that the medical examiner had testified about blood on the pillows. He then stated: "[A]nd that blood, if you remember [the medical examiner] testifying that the patterns on the pillow and what was there could have been and probably were the result of those being used as the instruments that caused [the victim's] death, which strangled or suffocated her. The pattern came from the lacerations on the lips." Appellant claims that this was a flagrant misrepresentation of the evidence because the medical examiner had specifically testified that she could not tell what instrument had caused the victim's death, only that it was a blunt object, perhaps a hand or a pillow. We first note that there was no contemporaneous objection to this part of the prosecutor's argument, though Appellant's attorney did mention it at a bench conference a few minutes later, when he tried to excuse his failure to object by noting that he could not "jump up at everything."

The medical examiner actually testified that the cause of death was the application of force to the throat and mouth of the victim, resulting in strangulation or smothering. She testified that the victim had bruises on her face and that her lower lip was swollen and lacerated. She also testified that if the victim had been smothered with a pillow, her facial wounds could have left blood on the pillow. On cross-examination, she described the victim's facial injuries again, and stated that she could not tell "exactly what object" had been used to smother the victim, but that it was a "blunt object, whether it was a hand or a pillow." While Appellant is correct that the prosecutor's description of the medical examiner's testimony was not completely accurate, it did not constitute a flagrant misrepresentation of the evidence. Certainly, the prosecutor's claim that the blood on the pillows came from the injuries to the victim's face was a reasonable inference from the evidence.

The next alleged misstatement by the prosecutor came in his discussion of the panties found near the victim's body. The prosecutor noted that Appellant's semen had been found in the victim's vagina. He then recounted Appellant's claim that the victim had gotten dressed after they had sex before taking him home. The prosecutor then stated: "[S]ome panties that was found in random places in the bathroom and bedroom were taken, were submitted to the forensic laboratory, and no results were delivered as to either one of those containing or having semen on them." Appellant's attorney objected to this statement, arguing at the bench conference, "[H]e knows that those panties were never tested." The prosecutor admitted that the panties had not been tested, but that they had been *submitted* for testing. He then agreed, at the judge's urging, to recharacterize his statement. When he returned to his argument, the prosecutor said: "You can look at and you will see that these two items were submitted to the forensic laboratory. Nothing was found to be tested, and the reports show that. Read the reports. Look at the reports. Look at what was established." He then made the argument that commonsense dictated that if the victim had put on her panties after having had sex, semen

from the sex-act would be on the panties. Appellant's attorney objected again and moved for a mistrial, stating that the prosecutor "knows good and well that those panties were never tested, period, and he's now suggesting that they tested them." The trial judge noted that as he understood the evidence, the panties were submitted, examined, and found not to have anything on them that could be tested. Thus, the judge stated, as long as the prosecutor was careful in what he said, his claims were a reasonable inference from the evidence. When he again returned to his argument, the prosecutor stated, "You will find that the forensic laboratory received those two pair of undergarments. They were examined. There was nothing found to test."

Appellant now contends that this portion of the prosecutor's argument was the most egregious misstatement of the evidence. He argues that the technician to whom the panties were submitted testified that her job was only to search for trace evidence, such as hair and fibers, thus it was improper for the prosecutor to imply that she had examined the panties for possible DNA evidence and that, because they had not been forwarded for testing, she had found no traces that might include DNA. The lab technician, however, never testified whether she examined items to determine if they should be tested for DNA testing, although she did testify that several items other than the panties—pillows and sheets found in the car, and a sheet from the victims bed—had been sent to be tested for DNA.

Though the prosecutor's characterization of this testimony is more troubling, we cannot say that it was not a reasonable inference. Obviously, someone at the foren-

sics laboratory decided some of the physical evidence should be tested for DNA and that some should not. The testimony at trial, however, did not reveal exactly how this decision is made. Given the testimony presented, it is possible, and not entirely unreasonable, to conclude that the panties were not tested because the technician who received them felt they were unlikely to contain DNA evidence. It is also possible, as Appellant now argues, that the items were not tested because of sloppy practice in the laboratory. Such a competing inference is also appropriate for a closing argument. The mere fact that evidence supports one argument does not foreclose the reasonableness of a different argument, so long as the evidence is consistent with both propositions. Thus, we cannot say that the prosecutor's characterization of the evidence exceeded the wide latitude allowed in closing arguments.

Finally, Appellant claims error in the prosecutor's statement near the end of closing argument that "[e]verything that could be tested that would result in a determination was done." Appellant claims that this was patently untrue since the panties had not been tested, several hairs found at the scene had not been tested, and the fingernail clippings from the victim were never tested.[6] In light of this recitation of untested evidence, we agree that the prosecutor's comment was technically incorrect. However, it is equally clear that the comment was merely a generic and relatively innocuous rhetorical statement about the overall quality of the scientific evidence. We also note that Appellant's attorney failed to preserve this alleged mischaracterization of the evidence because he did not object at trial (the

6. Appellant also claims that this statement is contradicted by the fact that Officer Schell failed to investigate the several Hispanic men with whom the victim had been involved with

previously. However, it is clear that the prosecutor's statement referred to the physical evidence sent to the forensics labs.

statement was first raised in the post-verdict motion for a new trial).

■ Ultimately, we conclude that the prosecutor's statements during closing argument did not stray outside the bounds of acceptability. Attorneys are allowed wide latitude in arguing the facts and drawing inferences from them in closing argument. Moreover, if the prosecutor's characterization of the evidence could be viewed as even slightly prejudicial, it was rendered harmless by the judge's repeated admonitions, as echoed by the prosecutor himself, that the jurors were to consider only the evidence and reasonable inferences from the evidence and that the attorney's arguments were not evidence.

For the foregoing reasons, the judgment of the Shelby Circuit Court is affirmed.

GRAVES, MINTON, SCOTT and WINTERSHEIMER, JJ., concur.

LAMBERT, C.J., dissents by separate opinion in which McANULTY, J., joins.

Dissenting opinion by Chief Justice LAMBERT.

Respectfully, I must disagree with the majority's analysis of the spousal testimonial privilege. The majority today holds that the privilege must be "invoked" before its protections are available. While this is so after the spouse is called as a witness, here the spouse was never called and a need to invoke the privilege never arose. Despite this, the Commonwealth was permitted to comment, over objection, upon the failure of the Defendant's spouse to testify. Under a strict reading of the majority opinion, a party wishing to prevent the testimony or comment thereon of any potential witnesses on privilege grounds must invoke all available privileges at the outset or be held to have committed waiver.

The spousal privilege grants a defendant the right to prevent his or her spouse from testifying in a criminal case. However, in the instant case, the prosecution did not call the spouse to testify. Thus, it is perplexing that the majority has placed upon the Defendant the burden of invoking a privilege to prevent testimony where there was never any attempt to procure or offer such testimony.

After posing the question of whether the spousal privilege is only a potential privilege that must be invoked to be cognizable, or whether it is a privilege conferred and automatically in effect unless it is waived, the majority states that our decisions approaching the issue are inconsistent. I disagree. *Sexton v. Commonwealth*[1] and *Gossett v. Com.*[2] are directly on point, and both held that the failure of a defendant's spouse to testify could not be the subject of unfavorable comment by the prosecution, precisely what occurred here. *Sexton* and *Gossett* are the only cases cited wherein the spouse's testimony was never sought, but the failure to testify subjected to unfavorable comment. Both cases were reversed. As in the instant case, the Court held that there was no need for the defendant to invoke the privilege to prevent the introduction of testimony and the unfavorable comment on failure of the witness spouse to testify. The cases relied on by the majority to create a conflict with *Sexton* and *Gossett* are simply inapplicable due to factual dissimilarity. In those cases, the spouses testified or at least attempted to testify against the defendant spouses.

In other circumstances, where the prosecution calls the defendant's spouse to testify, the defendant should be required to object on grounds of the spousal privilege.

1. 304 Ky. 172, 200 S.W.2d 290 (1947).

2. 402 S.W.2d 857 (Ky.1966).

At that point, a hearing could be held to determine whether the privilege applied and a ruling rendered based on the evidence produced at the hearing. However, the need to object or "invoke" the spousal privilege would not arise until and unless the prosecution sought the testimony the privilege was designed to prevent.

Thus, I believe that *Sexton* and *Gossett* govern this case and I have found no other cases that abrogate or conflict with them.

McANULTY, J., joins this dissenting opinion.